H. V. ALBRECHT ET AL. *v.* UNITED STATES[1]

United States Customs Court, Second Division

(Decided October 17, 1938)

*Strauss & Hedges* (*Howard C. Carter* of counsel) for the plaintiffs.

*Charles D. Lawrence*, Acting Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

---

[1] C. D. 46.

Before Tilson, Kincheloe, and Dallinger, Judges

Kincheloe, Judge: The merchandise here in issue consists of paper tissue-like disks of various sizes ranging from 2¼ up to 14 inches in diameter, as represented by Exhibits 1 to 4 and Illustrative Exhibits 5 to 28, inclusive. It was assessed for duty by the collector either under paragraph 1404, Tariff Act of 1930, as paper commonly or commercially known as tissue, or as articles made therefrom, at 6 cents per pound and 20 per centum ad valorem, or under paragraph 1413, as paper cut into any form, at the rate of 30 per centum ad valorem. The protests claim the merchandise properly dutiable under the *eo nomine* provision of paragraph 1409 for "filtering paper," at the rate of 5 cents per pound and 15 per centum ad valorem.

Mr. William Glaasen testified that he has been employed by Stanley Jordan & Co., one of the plaintiffs herein, since 1905; that he has been handling the paper here in question for twelve years, buying and selling it at wholesale and retail; that he has used and seen used the merchandise in question; that it is used for filtering coffee, and that he knows of no other use for it; that the function of the paper is to take out the sediment and the oils and fats in the coffee that are released by the boiling water; that when the coffee is made without the paper the oil shows on the surface when it cools, but that when the paper is used the oil is not present in the coffee (R. 37, 38); that he has sold the merchandise to restaurants, hotels, and coffee roasters, and has seen it used in some instances; and that his firm only imports this paper in disk form, and does not know the use of this paper in any other form (R. 60–70).

Howard Whitfield, another of plaintiffs' witnesses and an importer of Japanese paper for many years, testified that he is familiar with paper like said Exhibits 1 to 18; that he has been to Japan and seen it made, and has bought and sold such paper. He produced a sample of the fiber from which the paper is made (Illustrative Exhibit A), and described the process of making the paper as follows:

The fiber is first soaked. * * * It is then beaten up just the way you would take a large hammer and mash it up to pieces, and after that it is made similar to our papers in this country. When it is beaten up it comes out in the shape of water that looks like milk. That is what this paper is made from. Then it is put in a vat about the size and width of this table here and there is a screen made of bamboo wired with a little piece of copper wire, and these people take and dip this screen down and pick up the material and shake it, and that makes the residue, the water, go through the screen and the pieces of tissue that come out they lay off on a pile. They pile all that paper up that comes off the screen and then afterwards little Japanese girls take this paper, after it is pasted on a long board, similar to a piece of wall paper, and they put it out in the sun to dry, and then afterwards they go out and collect it and cut it to shape. It is all hand made goods, from start to finish. (R. 48, 49.)

The same witness stated that the paper disks are used by putting into a metal container which has a perforated disk on the bottom; that the paper is then placed on top of the disk, and the coffee is then put over the paper disk, and then boiling water is poured on top of that and filters through into the coffee pot without any residue (R. 49); that that is the only use of said Exhibits 1 to 28, and that he is familiar with the properties of this paper by seeing it made; that the paper must have strength so that the water will pass through the paper and hold the coffee back; that you can see the long fibers in the paper when held up to the light; that commercially it is only used for filtering purposes; that it can be used for wiping lenses, but that there is cheaper paper for that purpose; and that the paper is of long fiber, being sufficiently porous to allow the water to pass through and hold the residue. He defined filter paper as one that would allow fluid to pass through and at the same time hold back the residue of solid matter; that Exhibits 1 to 28 came within that term, and that the paper has been so used for twenty years; that the fiber from which Exhibits 1 to 28 is made comes from the Gampi bush in Japan, and that it is generally taken off the end of the bark; that the name of the paper in Exhibits 1 to 28 is Toso (R. 59); that the booklet of paper (Illustrative Exhibit B) is called Mino paper, which is machine made and weaker than the Toso paper (Exhibits 1 to 28), and that his firm imports paper very nearly alike for wiping lenses on battleship guns. Furthermore, that Toso paper is made in sheets, and then cut; and that sheets 20 by 30 inches, 480 to the ream, would weigh perhaps a little less than 4 pounds (R. 45–59).

Dester D. Coffee, a witness for the defendant and president of C. H. Coffin & Sons, of Winsted, Conn., manufacturers of light weight papers, testified that they make papers similar to Exhibits 1 to 28, but not exactly the same; that their papers differ in the dispersion of the fibers and the actual fibers themselves; that they have endeavored to produce a paper having the general characteristics of Exhibits 1 to 28, but that their paper is machine made, and is represented by Illustrative Exhibit F; that it is tissue paper, and that Exhibits 1 to 28 are tissue paper; that their paper is used for high grade fiction tissue, for lens wiping, and for use in mimeograph stencils; but that they do not import any papers (R. 75–79).

Richard T. Stevens, president of the Japan Paper Co., was the second witness for the Government. He has been connected with that company for thirty years, and stated that they import and deal in paper like Exhibits 1 to 28 in various size disks, and in sheets. He stated he has been to Japan and seen the paper manufactured; that this particular paper is known to them as Mino bibulous, the name Mino being the district in Japan in which it is made; that the paper

is made in the form of sheets. When shown Illustrative Exhibit A, introduced by plaintiffs as a sample of the fiber of which Exhibits 1 to 28 is made, and which comes from the Gampi bush in Japan, the witness stated that he could not tell whether it is Gampi or Kawzo; that the paper in booklet (Illustrative Exhibit B) is hand made Japanese paper made in the same manner and from practically the same material as Exhibits 1 to 28; that he has imported paper like Exhibits 1 to 28 in disk form, and that he sold it for filtering coffee in coffee percolators, and that he never made any sales of the disks like Exhibits 1 to 28 to anyone else for any other purpose; that some of the paper that his company imported in sheet form (Illustrative Exhibits G, H, and I) he sold to customers who cut it into disk form for use in coffee percolators, but he admitted that he himself had never seen said paper in sheet form cut into disk form; and that at the time of the passage of the Tariff Act of 1930 the chief use of paper identical or similar to Exhibits 1 to 28 was for some other purpose than filtering coffee, based upon his own experience in importing and selling both the disks and sheets (R. 79–97).

Another witness called by the defendant was the chief chemist in the Customs Laboratory at New York, who stated that they make analyses of different materials and that at times it is necessary for them to use paper for filtering purposes, but that he never used materials like Exhibits 1 to 28 for filtering liquids during his experience; that it is not the type of filtering paper used in the chemical laboratory; and he introduced in evidence Collective Illustrative Exhibit K as the kinds of paper his office has been using. He defined filter paper as "pulped mat or a sheet of paper usually round or square that is used to separate solids from liquids." He also agreed with the definition of "filter paper" as found in Webster's New International Dictionary, reading: "Porous, unsized paper for filtering liquids, drying crystals, etc." He admitted that Exhibits 1 to 28 are porous, and that they are also unsized.

The examiner of paper was also called as a witness by defendant, who stated that in his opinion Exhibits 1 to 28 were tissue paper.

A good deal of the foregoing testimony is undoubtedly irrelevant and immaterial to the real issue involved herein, which is simply whether the disks of paper as imported are chiefly used for filtering purposes so as to come within the specific *eo nomine* provision for filtering paper in said paragraph 1409. The testimony of the Government is mainly an effort to show that the merchandise is tissue paper, or a manufacture of tissue paper, and the Government so argues in its brief. It may be true that the sheets of paper from which the disks were cut to size is also a form of tissue paper, but it is tissue paper of a particular kind, texture, and quality very suit-

able and desirable for use in filtering coffee, and when so cut into the different size disks as imported there unquestionably was, according to the testimony, a complete dedication of the paper to one sole and exclusive use, namely, that for filtering coffee, and for no other. And as the paper also conforms to the common meaning and understanding of the term "filtering paper," which is not shown to be different commercially, it necessarily falls squarely within the specific provision for "filtering paper" for dutiable purposes. We think this proposition is too elemental in customs law to need any citation of authority.

Toilet paper is also made of tissue paper, and in the absence of any specific provision therefor might properly be considered a manufacture of such paper; but, in the face of an *eo nomine* designation for toilet paper, it would obviously be more specifically provided thereunder than as tissue paper, or a manufacture thereof. If the paper of which the disks in question are made had been imported in the form of sheets for various different purposes, the situation would, of course, be somewhat different, and, before such paper could be held to be filtering paper, chief use of the particular class or kind of paper for filtering purposes would have to be shown. It is not even certain from this record, however, that the same identical kind or quality of paper is imported in any other form for other purposes, or, if so, that such other purposes are greater than for filtering coffee.

The merchandise here under consideration is undoubtedly of the same kind and character as that passed on by us in *Crest Corporation* v. *United States*, T. D. 48888, 71 Treas. Dec. 535, wherein we stated that "filtering paper" is unquestionably a tariff designation by use and predominates over any other *eo nomine* designation not one of use, such as "tissue paper." Likewise, it is more specific than the provision in paragraph 1413 for "papers * * * cut * * * into designs or shapes * * * or other forms."

As the relevant facts in the present case are the same as those in the case cited, *supra*, namely, that the disks of paper as imported are solely or chiefly used for filtering coffee, we follow the same ruling as in that case and hold the merchandise dutiable as filtering paper under said paragraph 1409, as claimed by the plaintiffs. Judgment will be rendered accordingly.